## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

DAVID C. GRUNWALD, SR.,

|  |  |
|---|---|
| | CASE NO. 2:16-cv-12599 |
| *Plaintiff*, | DISTRICT JUDGE STEPHEN J. MURPHY, III |
| *v.* | MAGISTRATE JUDGE PATRICIA T. MORRIS |

COMMISSIONER OF SOCIAL SECURITY,

     *Defendant.*

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 21, 25)

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Grunwald is not disabled. Accordingly **IT IS RECOMMENDED** that Grunwald's Motion for Summary Judgment, (Doc. 21), be **DENIED**, the Commissioner's Motion, (Doc. 25), be **GRANTED**, and that this case be **AFFIRMED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned Magistrate Judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff David C. Grunwald, Sr.'s ("Grunwald") claim for a period of disability and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act 42

1

U.S.C. § 401 *et seq.* (Doc. 17). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 21, 25).

On November 14, 2012, Grunwald filed an application for DIB, alleging a disability onset date of October 6, 2012. (Tr. 210-216). The Commissioner denied his DIB claim. (Tr. 135-47). Grunwald then requested a hearing before an Administrative Law Judge ("ALJ"), which occurred on August 5, 2014, before ALJ Ethel Revels. (Tr. 88-134). At the hearing, Grunwald—represented by his attorney—testified, alongside Vocational Expert ("VE") Harry Cynowa. (*Id.*). The ALJ's written decision, issued January 26, 2015, found Grunwald not disabled. (Tr. 71-82). On May 9, 2016, the Appeals Council denied review, (Tr. 1-7), and Grunwald filed for judicial review of that final decision on July 12, 2016. (Doc. 1).

**B.     Standard of Review**

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

2

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

### C.   Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

3

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least eighteen years old and has a disability that began before age twenty-two (20 C.F.R.

404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D.     ALJ Findings

Following the five-step sequential analysis, the ALJ found Grunwald not disabled under the Act. (Tr. 71-82). At Step One, the ALJ found that Grunwald last met the insured status requirements of the Social Security Act on December 31, 2014, and had not engaged in substantial gainful activity in the interval between his amended alleged onset date of January 1, 2011 and his date last insured. (Tr. 73). At Step Two, the ALJ concluded that the following impairments qualified as severe: cardiac disorder, hypertension, obesity, diabetes mellitus, sleep apnea, restless leg syndrome, arthritis, and depression. (Tr. 74). The ALJ also decided, however, that none of these met or medically equaled a listed impairment at Step Three. (Tr. 74-75). Thereafter, the ALJ found that Grunwald had the residual functional capacity ("RFC") to perform a range of light work with the following additional limitations:

> need for a sit/stand option at will, but not to exceed 45 minutes at a time; simple, routine tasks equivalent to the SVP 1-2 skill level as defined in the Dictionary of Occupational Titles (DOT) due to occasional limitations in the ability to maintain concentration for extended periods (but not such that claimant would be off tasks [sic] more than 10 percent of the workday) and occasional difficulty understanding, remembering and carrying out detailed instructions; requires proximity to a bathroom; occasional climbing ramps and stairs; no climbing ladders, ropes or scaffolds; occasional postural activities including stooping, crouching, kneeling, or squatting; no crawling; no

operating at hazardous heights or around dangerous machinery; needs a relatively clean air work environment free from fumes, dusts and other pollutants; no work in temperature extremes or in wet, humid areas.

(Tr. 75). At Step Four, the ALJ found Grunwald incapable of performing his past relevant work as a motor vehicle assembler through his date last insured. (Tr. 80). But proceeding to Step Five, the ALJ determined that "there are jobs that exist in significant numbers in the national economy that the claimant can perform . . . ." (*Id.*).

### E.   Administrative Record

#### 1.   Medical Evidence

The Court has reviewed Grunwald's medical record. In lieu of summarizing his medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2.   Application Reports and Administrative Hearing

##### i.   Function Report

Grunwald submitted a Function Report which appears in the administrative record. (Tr. 274-81). Describing his conditions, he noted "I am a diab[e]tic and have heart problems[.] I can only work for a short period of time then I can['t] breath[e] very good[.] I get tired fast an[d] can['t] do a good job." (Tr. 274). He required a C-PAP machine to sleep. (Tr. 275). In a typical day, he would wake up at about 7:00 AM to take his stepson to school, then go home and "back to bed," wake at noon, eat, watch television, and pick up his son again at 3:00 AM. He did "nothing the rest of [the] day." (*Id.*). He cared for animals insofar as feeding them and letting them outside. (*Id.*). He indicated no problems

maintaining proper hygiene or other personal care matters. (*Id.*). Before his onset date, he could do "everything." (*Id.*).

To stay on schedule, he needed reminders to take his medication. (Tr. 276). He cooked potatoes, pork chops, mac' and cheese, sandwiches, and frozen food on a weekly basis for a "couple hours," though due to his illnesses, he had begun making healthier food. (*Id.*). He also vacuumed, mowed his lawn, laundered, and cleaned his house for a few hours "once a month." (*Id.*). His son helped him with these tasks. (*Id.*). He ventured outside a "couple hours a day," and retained the ability to drive. (Tr. 277). Twice a month, he shopped for groceries. (*Id.*). He relayed an ability to generally handle money and finances. (*Id.*).

As hobbies and interests, he identified "watching TV and going to [his] son['s] sporting events" a few times a week. (Tr. 278). He also used his computer "a lot" several times each day. (*Id.*). Though he indicated few social difficulties, he mentioned that "sometimes I get very angr[y] at things." (Tr. 279). Prompted to note abilities with which he encountered difficulty, Grunwald marked: lifting, standing, hearing, seeing, memory, and completing tasks. (*Id.*). He could walk one block before needing to rest for five to ten minutes. (*Id.*). And he could pay attention for only five to ten minutes, though he could follow written or spoken instructions "pretty good." (*Id.*). He did not handle changes in routine well. (Tr. 280). And "sometimes I can't fall asleep for long periods of time." (*Id.*).

### ii.     Webb's Testimony at the Administrative Hearing

Opening his testimony, Grunwald's counsel amended his alleged onset date to January 1, 2011. (Tr. 92). Grunwald then testified as to his disability: "[W]hen I walk, I

7

get short of breath. I get chest pains. Sometimes I get anxiety. I can't focus on certain things. I'm not a social person. My hands are weak from my carpal tunnel. My vision's not always good." (Tr. 97-98). He confirmed, as well, that "I have Type 2 diabetes. I take insulin twice a day, sometimes three times a day if it's high during the day. I use the bathroom frequently." (Tr. 98).

Extrapolating on his chest pain and shortness of breath, Grunwald noted that "I've had three stents put in my arteries" as well as "numerous stress tests, numerous cardiac catheterizations" and another catheterization "coming up next Monday" because "they think I have another blockage." (*Id.*). He could walk "about half a block" before he got shortness of breath, and he had been getting chest pains about "[o]nce every other day" in the run-up to the hearing. (Tr. 99). His doctors referred to the "burning sensation in my throat" as angina. (*Id.*). The sensation lasted for fifteen minutes to half an hour. (Tr. 100). Asked what the relationship might be between his chest pain and activity, Grunwald supposed "[h]ardly anything," though chest pain evaporated "when I do rest." (*Id.*). He then indicated that reaching and moving around could "bring[] on" chest pain. (Tr. 101). The smallest amount of activity resulting in chest pain was "[t]aking a shower"—"I get tired. I get short winded. I'm only in there for about five minutes and my chest starts to hurt, then I go lay down for a little bit and then I'm okay." (*Id.*). During the course of a day, he laid down three times for half an hour. (*Id.*).

His diminishing eyesight contributed to difficulties "with doing things," though his bifocals helped this somewhat. (Tr. 103). He also had difficulty "doing things and concentrating on what I'm doing. For instance, I don't know, let's say I make some toast

and the next thing I know, 15 minutes later I forget about it and the toast is still popped up in the toaster." (Tr. 106). He "very seldom" completed tasks because "I get frustrated with one and then I go to another one. The next thing you know I got three or four things and I'm not getting any one of them done." (*Id.*). He could "barely stay awake to watch a movie." (Tr. 107). Because he was "not a social person," he also had trouble following conversations. (Tr. 106).

Grunwald noted that his left leg "aches constantly" with a "tingling sensation in my feet." (Tr. 104). He suffered from restless leg syndrome. (Tr. 111). His hands ached as well due to "carpal tunnel. They fall asleep during the night. I have trouble sleeping." (Tr. 104). He said he could still lift up to ten pounds, but "I've dropped many glasses." (Tr. 105). "Sometimes I can button a shirt," but his wife sometimes helped him. (*Id.*). He needed help to open a jar because he had "[n]o strength hardly in my hands." (*Id.*).

To manage his diabetes, Grunwald checked his sugar three to five times a day, which took two to three minutes each time. (Tr. 102). Diabetes, he indicated, contributed to his frequent bathroom use. (Tr. 107). Speaking to this, Grunwald indicated that he used the bathroom "[t]wice an hour maybe" depending on the day, and that his "colitis" came without warning, such that "there have been times when I went in my pants . . . ." (*Id.*). Pressed further about his colitis, he indicated "I was just diagnosed with that this past year and I never followed up on it because I didn't have insurance." (Tr. 108). Most of his trips to the bathroom he attributed to urinary frequency from drinking "a lot of water" for his diabetes. (*Id.*). His colitis struck "[m]aybe once or twice a week." (*Id.*). Urinating took

about five minutes, while colitis-related visits could take "anywhere from ten to 20 minutes . . . ." (Tr. 109).

Speaking to his sleep apnea, Grunwald noted that "I sleep with a mask." (*Id.*). He also noted arthritis in his shoulders and back. (*Id.*). Pain therefrom lasted about half an hour and struck about twice a week. (*Id.*). He treated these issues with Motrin 800 and Tylenol 3. (Tr. 109-10). He could sit comfortably for "[a]bout half an hour, 45 minutes." (Tr. 110). He could not bend "[b]ecause it makes my back hurt." (Tr. 111). He could "reach, but I can't really grab. I can't grab something heavy." (*Id.*). Coupled with his leg pain, he did not climb stairs "very often." (*Id.*). And due to his restless leg syndrome and left leg pain, he could "stand for no more than 30 to 45 minutes[.]" (*Id.*).

Grunwald then testified to his depression. (*Id.*). "There are days where I just don't want to get out of bed." (Tr. 114). He stayed in his house four days a week. (*Id.*). As a result of his depression, diabetes, and stress, he gained sixteen pounds in two weeks. (Tr. 111-12). At the time of the hearing, Grunwald confessed having a hard time controlling his diabetes due to his "diet" and the fact that "I don't exercise" and "I'm not taking enough dose." (Tr. 112). "I eat a lot of fatty stuff. I'm not a vegetable and fruit eater. I never was." (Tr. 113). He drank "[d]iet pop." (*Id.*). He did not read the ingredients of the foods and beverages he consumed. (Tr. 114).

The ALJ proceeded to examine Grunwald's post-onset date work. (Tr. 115). He worked part-time for K-Mart for fifteen to sixteen months beginning in March of 2011. (Tr. 115-16). He also reported earnings for self-employment "[a]erating lawns." (Tr. 117). "I went out and got the business and my son physically did the aerating. It wasn't a

10

business, it was just on my own doing it. Trying to make an extra buck. Trying to make ends meet [sic]." (Tr. 117).

### iii.      The VE's Testimony at the Administrative Hearing

The VE began by classifying Grunwald's prior work as "[a]ssembler motor vehicle"—unskilled work at SVP 2, with medium exertion both as performed and per the DOT. (Tr. 118). The ALJ then proceeded to pose her first hypothetical: "[N]eeds simple, routine tasks such as those jobs at the SVP 1 or 2 level because I am finding occasional limitation in the ability to maintain concentration for extended periods, but not off task more than 10 percent of the day, as well as the inability to carry out detailed instructions. Our hypothetical claimant also needs proximity to a bathroom. That work should not require more than occasional climbing of ramps and stairs. That work must not require more than occasional kneeling, crouching, stooping or squatting. No climbing of ladders, ropes or scaffolds. No operating at hazardous height or around dangerous machinery. No crawling. Our hypothetical claimant would also need a relatively clean air work environment free from fumes, dusts and other pollutants. No work in temperature extremes or wet or humid areas. If you assume that, can our hypothetical claimant perform the claimant's prior relevant work?" (Tr. 118-19). The VE indicated that such a person could not perform Grunwald's past work, but that "[t]here would be work at the light exertional level and the sedentary exertional level." (Tr. 119). This included, at the light exertional level, work as: a "hand packager"—with 2,500 regional job availabilities and more than 100,000 national job availabilities—a "small products assembler"—with the same numbers, both regionally and nationally—and "visible inspector checker"—with 1,000

regional job availabilities and more than 80,000 national job availabilities. (*Id.*). At the sedentary exertional level, potential work included jobs as: a "bench hand"—with 3,250 regional job availabilities and more than 200,000 national job availabilities—a "final assembler"—with the same regional and national figures—and a "security monitor"—with 1,500 regional job availabilities and more than 120,000 national job availabilities.

For her second hypothetical, the ALJ added a "sit/stand option" restriction. (Tr. 120). The VE indicated "my responses would be the same as hypothetical one, same job, same numbers at both the light and sedentary exertional levels." (*Id.*).

In the third hypothetical, the ALJ again added to the limitations in the first two hypotheticals "that our hypothetical claimant that also needs work that does not require constant use of the hand, would such a person be able to perform at the light and sedentary level?" (Tr. 120-21). The VE confirmed that, "[a]gain, same response, same jobs, same numbers." (Tr. 121). He offered, as well, that his testimony was consistent with the DOT except for "the indication of the sit/stand option" and "the amount of time off task or proximity to a bathroom," which he in turn based "upon my experience placing people in the local labor market." (Tr. 121).

In his line of questioning, Grunwald's attorney questioned whether the VE's job numbers pertained to specific "representative jobs" or "broad classifications," and the VE confirmed his testimony related to broad classifications rather than representative jobs. (Tr. 130). The VE noted that his estimates were based on "a wide range of sources," and that they were conservative. (Tr. 131-32). When counsel asked the VE for the documents "that [his] experience [was] based on," the VE identified a number of sources, (Tr. 132), but also

indicated that he could not furnish his "own materials" upon which he based his opinion because "[t]hose are 20 years of experience . . . ." (Tr. 133). Counsel then objected on the record to the "foundation reliability of the materials not available . . . ." (*Id.*).

## F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).   Both    "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.*. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996). Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186,

at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)    [D]aily activities;
(ii)   The location, duration, frequency, and intensity of . . . pain;
(iii)  Precipitating and aggravating factors;
(iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)    Treatment, other than medication, . . . received for relief of . . . pain;
(vi)   Any measures . . . used to relieve . . . pain.

16

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### G.    Analysis

Grunwald presents five general arguments in his brief: (1) the RFC provision that Grunwald be granted proximity to a bathroom is vague and fails to account for his colitis and urinary frequency; (2) the ALJ improperly handled Grunwald's obesity in making her credibility and RFC determinations; (3) the ALJ should have granted more weight to his treating physicians, and inappropriately discounted their opinions; (4) the ALJ 'played doctor' and, as a result, offered a heavily circumscribed and medically unsound credibility determination; and (5) the ALJ should not have relied on the VE's job figures because he

could not produce the documents on which his opinion relied. I discuss each argument in turn.

### 1.    Colitis and Urinary Frequency

Grunwald centers his first argument on his allegations of colitis and urinary frequency, and in turn, the ALJ's treatment thereof in the RFC. Among the limitations the ALJ incorporated into the RFC was that Grunwald requires "proximity to a bathroom . . . ." (Tr. 75). He contends that the ALJ "does not explain how being close to a bathroom accommodates the need to actually utilize the bathroom which would inevitably take [him] away from the workstation." (Doc. 21 at ID 935). This restriction, for instance, fails to actually accommodate the *time* he would need in the bathroom, and rests on the ALJ's unfounded assumption that his colitis and urinary frequency could be managed with medication. (Doc. 21 at ID 936-37). In his reply to the Commissioner's Motion for Summary Judgment, Grunwald doubles down on this argument, suggesting that the ALJ's opinion omits mention of colitis in either Step Two or the RFC, and urinary frequency entirely. (Doc. 27 at ID 984, 985). In response, the Commissioner argues that Grunwald "has not explained why the RFC providing close proximity to a bathroom failed to account for [his colitis and urinary frequency]," nor "established that his colitis was an ongoing severe impairment that had lasted or was expected to last for 12 months or greater." (Doc. 25 at ID 964-65).

In disability cases, "the burden of proof lies with the claimant at steps one through four," shifting to the Commissioner "only if the fifth step, proving that there is work available in the economy that the claimant can perform, is reached." *Her v. Comm'r of Soc.*

*Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). As a matter of law, any impairment lasting (or expected to last) less than twelve months is not disabling. *See* 20 C.F.R. § 404.1509; *see also, e.g.*, *Auer v. Sec'y of Health & Human Servs.*, 830 F.2d 594, 596 (6th Cir. 1987) ("[T]he twelve month duration requirement . . . has become an essential part of the evaluation process."). The ALJ plainly considered Grunwald's claimed colitis and urinary frequency, as the hearing transcript—and her written decision—readily show. (Tr. 98, 107-09) (questioning Grunwald as to his urinary frequency and colitis); (Tr. 76-77) (mentioning Grunwald's testimony as to these conditions and his diagnosis of mild ischemic colitis). The ALJ reasoned, however, that the urinary frequency arose from Grunwald's diabetes—as he himself indicated, (Tr. 108) ("Because of my diabetes and I have to drink a lot of water.")—as did his colitis and rectal lesions, which could be (and had been) "stabilized" with pain relief medication and dietary discipline. (Tr. 77).

Grunwald responds by noting that the ALJ failed to address his testimony that he lost his insurance and could not seek further treatment for his colitis. (Doc. 21 at ID 937). *See generally* SSR 96-7p, 1996 WL 374186, at *7 (S.S.A. July 2, 1996) ("[T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment."). On these facts, however, I cannot divine error from this aspect of the ALJ's analysis, as she did not draw any inferences whatsoever from Grunwald's failure to seek treatment for colitis. *Compare McKenzie v. Comm'r of Soc. Sec.*, No. 2:15-CV-14488, 2016 WL

19

6404075, at *7 (E.D. Mich. Sept. 30, 2016), *report and recommendation adopted,* No. 15-14488, 2016 WL 6277158 (E.D. Mich. Oct. 27, 2016) ("[T]he ALJ failed to account for Plaintiff's inability to afford treatment, and instead *discounted her credibility* based on a lack of treatment and noncompliance." (emphasis added)), *with Hensley v. Comm'r of Soc. Sec.*, No. 1:15CV711, 2017 WL 1055152, at *4 (S.D. Ohio Mar. 21, 2017) (finding no error where the ALJ rested his opinion as to a condition on information contained in the scare records thereof, but "did not cite a lack of medical treatment as a basis for her finding[]" that the condition was not disabling). Rather, the ALJ here merely noted that evidence showed his gastrointestinal issues often arose secondary to uncontrolled diabetes, and that an attending physician successfully stabilized his colitis with pain medications. (Tr. 388) ("Uncontrolled [diabetes mellitus] and its complications discussed in detail"); (Tr. 391) ("All symptoms related to uncontrolled [diabetes mellitus] . . . .") (Tr. 397) (noting Grunwald's need to "lose weight," "exercise," and switch to a "low fat/low carb diet" in relation to his uncontrolled diabetes). As the ALJ no doubt noticed, having cited medical records arising after August 2013 (when Grunwald lost his insurance), Grunwald continued to receive medical treatment for various conditions, yet—so far as this Court can discern—the word "colitis" appears again as a present condition (without elaboration) only in Dr. Mohey's medical source statement. (Tr. 835); *cf. Johnson v. Comm'r of Soc. Sec.*, No. 13-CV-11463, 2014 WL 2207053, at *7 (E.D. Mich. May 28, 2014) ("Because the transcript shows that she was able to obtain needed treatment on a regular basis despite the alleged lack of health insurance, a remand on the basis that the ALJ did not abide by the

requirements of SSR 96-7p is not warranted."). In sum, the ALJ's findings are supported by substantial evidence.

In any case, Grunwald makes only a weak case that the ALJ should have made a specific finding as to the frequency and duration of his bathroom usage in the RFC. He quotes *Hubbard v. Comm'r of Soc. Sec.*, No. 11-11140, 2012 WL 883612, at *7 (E.D. Mich. Feb. 27, 2012), *report and recommendation adopted,* No. 11-11140, 2012 WL 858636 (E.D. Mich. Mar. 14, 2012) (quoting *Green v. Astrue*, No. 3:09-CV-331, 2010 WL 2901765, at *5 (E.D. Tenn. July 2, 2010), *report and recommendation adopted,* No. 3:09-CV-331, 2010 WL 2901762 (E.D. Tenn. July 20, 2010)), which noted that "other courts have concluded that where a social security claimant has an impairment that requires 'ready access to a bathroom' and the freedom to use it 'as needed,' an ALJ should 'make a specific finding concerning the frequency and duration of [the claimant's] bathroom usage as part of the RFC." Although *Hubbard*—an unpublished opinion—quotes *Green*, an unpublished decision from a sister court in the Sixth Circuit, *Green* in turn quotes an unpublished seventh circuit case, *Brueggen v. Barnhart*, No. 06-C-0154-C, 2006 WL 5999614, at *7 (WD. Wis. Dec. 15, 2006). In *Brueggen*, the RFC provision allowing proximity to a bathroom and use 'as needed' sparked remandable confusion—the ALJ discounted Brueggen's claim that she needed to use the bathroom seven times a day, but did not indicate how many such breaks 'as needed' might encompass. *Id.* ("Plaintiff makes a valid point when she argues that the ALJ could not just jump from her conclusion that plaintiff's complaints were not entirely credible to her finding that plaintiff could return to her past relevant work without explaining how she reconciled plaintiff's need to use the bathroom

21

at will with the VE"s testimony concerning the degree to which such bathroom use is generally tolerated by employers."). Moreover, the *Brueggen* ALJ found that Brueggen's *only* severe impairment was irritable bowel syndrome. *Id.* at *3. The *Green* and *Hubbard* ALJs likewise found urinary incontinence or chronic diarrhea to be a severe impairment for their respective claimants. *Hubbard*, 2012 WL 883612, at *7; *Green*, 2010 WL 2901765, at *5. By contrast, the ALJ here did not find that Grunwald's incontinence caused more than mild limitations. She derived the 'proximity' limitation from his concern that bowel movements came with "no warning" once to twice a week, and drinking water for his diabetes required frequent urination—both of which could be accommodated with proximity to a bathroom. (Tr. 107-08). And she did not draw any negative credibility inference from this testimony. This Court can find no error in the ALJ's RFC on this ground. *See, e.g.*, *Roberts v. Colvin*, No. 3:12-CV-00461, 2015 WL 2238329, at *12 (M.D. Tenn. May 12, 2015) (distinguishing between limitations designed to accommodate *immediate* access to a bathroom and mere *proximity*, and finding a 'ready access' limitation sufficient to accommodate impairments requiring proximity to bathroom facilities); *cf. Powell v. Comm'r of Soc. Sec.*, No. 2:12-CV-12955, 2013 WL 3762954, at *11 (E.D. Mich. July 17, 2013) (remanding because the ALJ "discount[ed] plaintiff's and Dr. Peters' claims of frequency in their entirety, and he wholly failed to incorporate a need for restroom breaks, ready access to a bathroom, or any similar accommodation in his RFC or the hypothetical question he propounded to the vocational expert").

    This conclusion seems especially apt where, as here, Grunwald failed to present evidence in his brief as to the dimensions the ALJ's 'proximity' limitation should have

taken, and declined to coax more information out of the VE at the hearing as to whether the frequency of bathroom breaks he now alleges would have precluded employment. *See Walker v. Comm'r of Soc. Sec. Admin.*, No. 3:12-CV-2075, 2013 WL 5781181, at *7 (N.D. Ohio Oct. 25, 2013) ("Beyond offering Plaintiff's own statements . . . Plaintiff fails to point to any medical opinion assigning specific limitations on Plaintiff's ability to work because of incontinence or diarrhea. It was Plaintiff's burden to prove the existence of a disabling condition within the relevant period, expected to last for a period of twelve months. . . . For example, although represented during the hearing, Plaintiff's counsel failed to specifically examine the VE regarding the need for Plaintiff to take bathroom breaks, beyond eliciting a response from the VE that an individual who would be off task approximately ten-percent of the day, would be 'excessive.'" (internal citation omitted)). Even Dr. Mohey's functional report—the only one to mention colitis or urinary frequency—fails to attribute to these impairments any resulting limitations. (Tr. 834-38).

For these reasons, the Court should discount Grunwald's argument on this count.

### 2.   Obesity

Grunwald next avers that the ALJ, aside from noting his obesity and deeming it 'severe,' declined to discuss obesity "in combination with other impairments" as required by SSR 02-1p. (Doc. 21 at ID 938). Because his obesity allegedly affects "his other impairments including sleep apnea, colitis, lumbar spondylosis and CAD," Grunwald supposes that "[t]he ALJ's extremely cursory mention of . . . obesity should not suffice." (Doc. 21 at ID 940). The Commissioner's riposte points to *Essary v. Commissioner of Social Security*, 114 F. App'x 662, 667 (6th Cir. 2004)—requiring claimants to present

evidence of functional limitations stemming from their obesity—and suggests that Grunwald "failed to identify any additional limitation that the ALJ should have imposed to more accurately account for his condition." (Doc. 25 at ID 963).

SSR 02-1p explains that obesity is "a medically determinable impairment" as well as "a risk factor that increases an individual's chances of developing impairments in most body systems," which "may also cause or contribute to mental impairments" in ways "subtle" or otherwise. 2002 WL 34686281, at *1, *3 (S.S.A. Sept. 12, 2002). It "remind[s] adjudicators to consider its effects when evaluating disability" and that "the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately." *Id.* at *1. The ruling "does not mandate a particular mode of analysis. It only states that obesity, in combination with other impairments, 'may' increase the severity of the other limitations." *Blesdoe v. Barnhart*, 165 F. App'x 408, 411-12 (6th Cir. 2006). Even so, case law suggests that where a claimant alleges that her obesity causes work-related limitations on her application or at a hearing, failure to consider it may constitute reversible error. *See Oaks v. Colvin*, No. 13-CV-917-JTC, 2014 WL 5782486, at *9 (W.D.N.Y. Nov. 6, 2014) ("[W]here the record contains evidence indicating limitation of function due to obesity, the ALJ must consider the effect of obesity on the claimant's ability to do basic work activities at steps two through four of the sequential evaluation process."); *cf. Long v. Colvin*, No. 14-5189, 2015 WL 7012852, at *2 (W.D. Ark. Nov. 12, 2015) ("Given the medical evidence, which fails to establish obesity caused work-related limitations, and Plaintiff's failure to allege the obesity as a disabling condition on her application or at the hearing, the ALJ's decision is not reversible error.").

As an initial matter, I note that Grunwald nowhere cites evidence showing she suffered work-related limitations from obesity. *See generally* (Doc. 21 at ID 938-40). To find error in the ALJ's decision to omit discussion thereof would flip the applicable burden. *Accord Essary v. Comm'r of Soc. Sec.*, 114 F. App'x 662, 667 (6th Cir. 2004) ("The absence of further elaboration on the issue of obesity likely stems from the fact that Essary failed to present evidence of any functional limitations resulting specifically from her obesity."); *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994) ("Claimant bears the burden of proving his entitlement to benefits.").

Even if one elides this failing, Grunwald cannot show any deficit in the ALJ's opinion as to obesity. Generously construed, he notes that "clearly the ALJ adopts the impairments found by Dr. Mohey and his references to obesity yet not his functional limitations," perhaps contending the ALJ *should have* adopted Dr. Mohey's functional limitations *in toto*—or else given explicit voice to the reasons for her departure therefrom. The ALJ *did*, however, explain why she could not adopt Dr. Mohey's RFC, noting that he "suggest[ed] acute restrictions for impairments that are supported by medical documents indicating only mild to moderate objective findings." (Tr. 79).[1] Further, the ALJ anchored her conclusions in a detailed discussion of those conditions obesity may potentially exacerbate, making express reference to this risk, and citing to medical sources that account for Grunwald's obesity in the process. (Tr. 77-80); *see Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 443 (6th Cir. 2010) ("Every medical opinion that the ALJ evaluated

---

[1] I mention the ALJ's treatment of Dr. Mohey here only as necessary to show that the ALJ provided reasons for rejecting Dr. Mohey's functional limitations, and proceed to discuss it in greater detail below.

acknowledged Coldiron's obesity. Thus, by utilizing the opinions of these physicians in fashioning Coldiron's RFC, the ALJ incorporated the effect that obesity has on the claimant's ability to work into the RFC he constructed.").

For these reasons, Grunwald's contention as to the ALJ's treatment of his obesity also lacks merit.

### 3. Treating Physicians

Listing the factors an ALJ must consider when not affording a claimant's treating physician controlling weight, Grunwald posits that the ALJ failed to give 'good reasons' for discounting opinions from Dr. Mohey and Dr. Garg, and instead "simply assert[ed] that the opinions are discounted as not supported by the evidence." (Doc. 21 at ID 941). Gesturing toward evidence consistent with these medical opinions, Grunwald suggests the ALJ 'played doctor' by "adopt[ing] an RFC that she has generated based on interpretations of raw medical data," contravening the applicable rules and regulations. (Doc. 21 at ID 943). The Commissioner, by contrast, contends that "[t]he ALJ reasonably viewed Dr. Mohey's and Dr. Garg's opinions of debilitating limitations to be inconsistent with and unsupported by their treatment notes." (Doc. 25 at ID 975).

Evaluating medical source statements requires considering factors such as the nature of the source's examining relationship with the client, 20 C.F.R. § 416.927(c)(1), the source's treatment relationship with the client, *id.* § (c)(2), the supportability of the source's opinion, *id.* § (c)(3), the consistency of the opinion with the record as a whole, *id.* § (c)(4), whether the source is a specialist opining on areas within her specialty, *id.* § (c)(5), as well as "any factors" the claimant or others "bring to [the Commissioner's] attention, or of

which [the Commissioner] is aware, which tend to support or contradict the opinion," *id* § (c)(6). The ALJ "will always give good reasons. . . for the weight" given a "*treating source's opinion.*" *Id* § (c)(2) (emphasis added). The ALJ, however, need not give 'good reasons' with respect to 'other sources'—rather, he "generally should explain the weight given to opinions from . . . 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-03p, 2006 WL 2329939, at *6 (S.S.A. Aug. 9, 2006). There remains an important "distinction between what an adjudicator must consider and what the adjudicator must explain." *Id.*

The administrative record tends to validate the Commissioner's estimation, and the ALJ's reasoning as to Dr. Mohey and Dr. Garg was not so rote as Grunwald supposes. Dr. Mohey's medical examinations repeatedly disclosed unlabored breathing and normal breath sounds, as well as denials of fatigue, shortness of breath, joint pain, and limitation of motion. (Tr. 389-93, 404-06). He provided no clinical support for his later-submitted RFC. *See generally* (Tr. 835-38). Dr. Garg's medical examinations, similarly, showed normal or mild symptomology. (Tr. 709-10, 729-32). The ALJ—after discussing the medical evidence flowing from Dr. Mohey, Dr. Garg, and other medical sources—discounted these opinions as internally inconsistent, which was accurate. (Tr. 79). Indeed, the implication bubbling out from the ALJ's evidentiary discussion is that Dr. Mohey's and Dr. Garg's RFC assessments featured questionable supportability and fell highly out of sync with the remainder of the medical evidence. *See, e.g.*, *Nelson v. Comm'r of Soc.*

*Sec.*, 195 F. App'x 462, 470 (6th Cir. 2006) ("[W]e find that the ALJ's evaluation of Nelson's mental impairments indirectly attacks both the supportability of [his treating sources'] opinions and the consistency of those opinions with the rest of the record evidence."). And the ALJ reasonably noted that Grunwald's Function Report listed no problems completing activities of daily living. (Tr. 80, 275). With these facts at the forefront, I cannot say the ALJ erred in evaluating Grunwald's treating sources.

Nor can I agree with Grunwald that the ALJ erred in "rejecting all opinions of record and arriv[ing] at her own RFC." (Doc. 21 at ID 943). ALJs retain discretion to grant medical source opinions weight "only insofar as they are supported by evidence in the case record, . . ." SSR 96-6p, 1996 WL 374180, at *2 (S.S.A. July 2, 1996). As discussed at length—both above and below—the ALJ rests her RFC on substantial evidence. In any case, courts from this Circuit have regularly rejected Grunwald's argument on this count, and so must I. *See, e.g.*, *Buck v. Berryhill*, No. 0:15-CV-00117-GFVT, 2017 WL 1098821, at *6 (E.D. Ky. Mar. 23, 2017) ("[W]hen considering medical source opinions, an ALJ has the discretion to 'decide whether to adopt or not adopt each one.'" (quoting SSR 96-5p, 1996 WL 374183, at *4 (S.S.A. July 2, 1996))); *Kolasa v. Comm'r of Soc. Sec.*, No. 13-CV-14311, 2015 WL 1119953, at *5 (E.D. Mich. Mar. 11, 2015) ("As mentioned above, the ALJ does not need a medical opinion to support his residual functional capacity determination and does not have to adopt any medical opinion verbatim, especially when there is contrary evidence.").

### 4.   Credibility Determination

In making her credibility determination, Grunwald supposes the ALJ "did not consider [his] chest pain, lower extremity pain or shortness of breath consistent with the ejection fraction of 45 and lesion of about 40-50 percent," while assuming, without support, that his activities of daily living and "post-onset date work at K-Mart and as a self-employed lawn worker support[ed] an assessment of more than sedentary activity." (Doc. 21 at ID 944). Again, had the ALJ not "play[ed] doctor," she would have recognized the veracity of Grunwald's statements. (Doc. 21 at ID 944). To this, the Commissioner notes other record evidence showing numerous 'normal' ejection fraction scores, (Doc. 25 at ID 969), no evidence of radiculopathy, (Doc. 25 at ID 970), and a robust set of activities of daily living, (Doc. 25 at ID 971-72). In addition, the Commissioner suggests that Grunwald's post-onset date work was, indeed, relevant to the credibility determination. (Doc. 25 at ID 972).

The substantial-evidence standard gives ALJs a "'zone of choice' in which [they] may go either way, without being second-guessed by federal courts." *Trandafir v. Comm'r of Soc. Sec.*, 58 F. App'x 113, 115 (6th Cir. 2003) (quoting *Mullen v. Bowen*, 800 F.2d, 535, 545 (6th Cir. 1986)). And where an ALJ's interpretation of the record—in contrast to the claimant's allegations of "unsubstantiated restrictions"—itself rests on substantial evidence, the Sixth Circuit cautions against calling into question her credibility determination. *Diamond v. Comm'r of Soc. Sec.*, 154 F. App'x 478, 484 (6th Cir. 2005); *accord, e.g.*, *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 642 (E.D. Mich. 1994) ("[S]pecial deference is to be given to the ALJ's credibility determinations and the

29

Court should not 'second-guess' the conclusions of the Secretary concerning the claimant's credibility. This is true even when the Court might reach a different conclusion based on the same set of facts.").

The record at issue supports the ALJ's credibility finding. As the Commissioner notes, Grunwald's ejection fraction score ranked as normal more often than abnormal in the relevant period. *Compare* (Tr. 840) (August 2014), *with* (Tr. 587-88) (March 2011), *and* (Tr. 710, 814) (September 2012), *and* (Tr. 709, 813) (May 2014). That the ALJ discussed Dr. Flores's opinion—which relied extensively on these findings—both demonstrates her consideration thereof and undermines Grunwald's concern that the ALJ 'played doctor' in heeding such evidence. Grunwald's "designation of class II heart disease," (Doc. 27 at ID 987), remains a *diagnosis* whose description does not, in itself, speak to the severity of the condition or its impact on his ability to work. *E.g.*, *Despins v. Comm'r of Soc. Sec.*, 257 F. App'x 923, 930 (6th Cir. 2007) ("The mere existence of . . . impairments . . . does not establish that [a claimant] was significantly limited from performing basic work activities for a continuous period of time."); *accord McPhee v. Comm'r of Soc. Sec.*, No. 12-CV-13931, 2013 WL 3224420, at *5 (E.D. Mich. June 25, 2013) ("[A] mere diagnosis does not equate to a 'severe' impairment or indicate how that impairment may or may not manifest into work-related functional limitations."). And the inability of physicians to rule out small fiber neuropathy does not, as Grunwald seems to believe, strikingly endorse his subjective assertions as to left leg pain—evidence that small fiber neuropathy *could* plague Grunwald is quite distinct from evidence that it *did and does* plague him, and Grunwald carries the burden to prove the latter fact, not the former.

Moreover, the ALJ reasonably cited Grunwald's ability to engage two post-onset date jobs and a number of household tasks—namely, care for his children and dogs, dress, bathe, cook, vacuum, mow the lawn, do laundry, clean the house, drive a car, grocery shop, manage money, and attend his son's sporting events a few times a week—as disqualifying his assertions and those of his treating sources. (Tr. 79-80).

For these reasons, the ALJ's credibility determination is supported by substantial evidence, and the Court should not disturb it.

### 5.   Step Five Determination

Grunwald last avers that "[t]he ALJ accepted without any supporting evidence the VE's testimony as to job numbers" when the VE "gave job numbers" that "pertained to a broad classification, not the specific DOT." (Doc. 21 at ID 946). As he points out, "[t]he representative asked for the documents upon which the consultant based his job numbers to which the consultant stated they were publically available or available to purchase," to which Grunwald "formally objected" on the grounds that "the materials [were] not generally . . . available." (Doc. 21 at ID 946). Specifically, Grunwald urges this Court to adopt the Seventh Circuit rule set forth in *McKinnie v. Barnhart*, 368 F.3d 907, 911 (7th Cir. 2004), which requires an ALJ to acquire the evidence upon which a VE places his trust or, at least, ask the VE for clarity. (*Id.*).

In *McKinnie*, the Seventh Circuit invoked their ruling in *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002), which said experts were "free to give a bottom line [job figure], provided that the underlying data and reasoning are available on demand." 279 F.3d 441, 446 (7th Cir. 2002) (citing Fed. R. Evid. 704(a)). *McKinnie* then pushed this

31

dicta one step further, requiring VEs to make the data upon which they relied "available on demand" if challenged. 368 F.3d at 911. But as the Commissioner aptly notes—citing *Brault v. Social Security Administration, Commissioner*—"[t]he *Donahue* rule . . . has not been a popular export." 683 F.3d 443, 449 (2d Cir. 2012). As *Brault* explained, *Donahue* "relied heavily on the principles, if not the actual authority, of Fed. R. Evid. 702 and *Daubert* [*v. Merrell Dow Pharmaceuticals, Inc.*,] 509 U.S. 579 [(1993)]. . . . But Congress has provided, quite clearly, that the Federal Rules of Evidence do not apply in Social Security proceedings." *Id.* "It is unclear . . . why the Seventh Circuit would acknowledge in *Donahue* that ALJs are not bound by the Rules of Evidence, but then turn around and require ALJs to hew so closely to *Daubert*'s principles." *Id.*

Several courts in the Sixth Circuit likewise entertain doubt concerning the Seventh Circuit's approach. Facing the issue whether to permit an ALJ's reliance on VE testimony as to broader categories of jobs that include some of the DOT's narrower categories of jobs, the court in *Baty v. Commissioner of Social Security* noted that "courts have been reluctant to hold that VEs must have technical knowledge of the raw data and methods supporting the statistics." No. 1:14-CV-14669, 2016 WL 6246387, at *6 (E.D. Mich. Feb. 9, 2016), *report and recommendation adopted,* No. 14-14669, 2016 WL 1056083 (E.D. Mich. Mar. 17, 2016); *see also Guiton v. Colvin*, 546 F. App'x 137, 142 (4th Cir. 2013) ("[I]f we required a VE to produce job statistics specific to the DOT coded occupations a claimant can perform, it is unlikely that the Commissioner would ever succeed in satisfying her burden."). Oftentimes, however, these courts have wriggled free from directly confronting the Seventh Circuit's approach because the claimant failed to challenge the

VE's data at her hearing. *E.g. Szymanski v. Comm'r of Soc. Sec.*, No. 3:10 CV 1459, 2011 WL 4541299, at *17 (N.D. Ohio Aug. 5, 2011), *report and recommendation adopted in part,* No. 3:10 CV 1459, 2011 WL 4541294 (N.D. Ohio Sept. 29, 2011); *cf. Wade v. Colvin*, No. CV 13-28-WOB-CJS, 2014 WL 12573833, at *7 (E.D. Ky. Jan. 6, 2014), *report and recommendation adopted,* No. CV 2013-28-WOB-CJS, 2014 WL 12591621 (E.D. Ky. Feb. 25, 2014) (evading this question because remand was justified on other grounds); *Yopp-Barber v. Comm'r of Soc. Sec.*, 56 F. App'x 688, 690 (6th Cir. 2003) ("Counsel also cannot complain of the failure of the VE to supply specific statistical evidence in the absence of an express request by counsel for those statistics."). Grunwald correctly notes that he directly challenged the VE's data, and thus this Court must face the question head on.

In *Richardson v. Perales*, 402 U.S. 389, 400-01 (1971), the Supreme Court held that "strict rules of evidence, applicable in the courtroom, are not to operate at social security hearings," for the "administrative procedure, and . . . hearings, should be understandable to the layman claimant, should not necessarily be stiff and comfortable only for the trained attorney, and should be liberal and not strict in tone and operation. This is the obvious intent of Congress so long as the procedures are fundamentally fair." *See, e.g.*, *Longanecker v. Comm'r of Soc. Sec.*, No. 1:16-CV-417, 2017 WL 217802, at *5 (W.D. Mich. Jan. 19, 2017) (noting that "the Federal Rules of Evidence do not apply in administrative hearings before the Social Security Administration" and collecting cases); *Perry v. Comm'r of Soc. Sec.*, No. 12-11068, 2013 WL 1148229, at *2 n.1 (E.D. Mich. Mar. 19, 2013) (same); *cf. Arnone v. Comm'r of Soc. Sec.*, No. 1:11-CV-316, 2012 WL

7658385, at *8 (W.D. Mich. Sept. 26, 2012), *report and recommendation adopted,* No. 1:11-CV-316, 2013 WL 838305 (W.D. Mich. Mar. 6, 2013) ("Plaintiff concedes that the Federal Rules of Evidence do not apply in social security proceedings. . . . Nonetheless, he argues that the 'due process and common law policies' behind the evidence rules prohibit the ALJ's considering of his use of illegal drugs as undermining his credibility. This court and others have consistently rejected plaintiff's argument."). Although the Federal Rules of Evidence remain "instructive," *Perry*, 2013 WL 1148229, at *2 n.1 (quoting *Slover v. Comm'r, Soc. Sec. Admin.*, CV-10-258-HZ, 2011 WL 1299615, at *7 (D. Or. Apr. 4, 2011)), the aversion to their strict operation in the Social Security context expressed in *Perales* counsels against a finding for Grunwald on these facts.

In the testimony at issue, the VE identified the sources his "experience [was] based on"—namely, the "Michigan Office of Labor Market Information, Department of Career Development, U.S. Publishing, Department of Labor Census information, Occupational Outlook Handbook," and "Occupational Employment Quarterly"—and noted that they were "all publically available or available to purchase." (Tr. 132). When Grunwald's counsel demanded the VE's "own materials," the VE identified them as "20 years of experience . . . ." (Tr. 133). The VE also clarified that the figures he provided remained conservative—"significantly less than what the actual number would be." (Tr. 132). Properly construed, Grunwald objects not so much to the VE's failure to supply the sources upon which his experience was grounded, but rather the ALJ's implicit finding that the VE's testimony was credible. Ultimately, "[t]he ALJ is responsible for determining the credibility of the VE's testimony"—*Watt v. Comm'r of Soc. Sec.*, No. 15-CV-12833, 2016

WL 4536424, at *2 (E.D. Mich. Aug. 31, 2016) (citing *Sias v. Sec'y of Health & Human Servs.*, 861 F.2d 475, 481 (6th Cir. 1988))—particularly where, as here, "the VE's credibility was subject to 'vigorous cross-examination,'" *id.* (quoting *Barker v. Shalala*, 40 F.3d 789, 795 (6th Cir. 1994)). *Accord Cox v. Comm'r of Soc. Sec.*, No. 15-12472, 2016 WL 7985331, at *8 (E.D. Mich. Aug. 19, 2016), *report and recommendation adopted,* No. 15-12472, 2016 WL 5939289 (E.D. Mich. Oct. 13, 2016) ("When the testimony of a vocational expert differs from the DOT, the ALJ may rely on the experience of the VE."); *cf. Lewis v. Comm'r of Soc. Sec.*, No. 3:12-CV-01720, 2013 WL 5563764, at *33 (N.D. Ohio Sept. 30, 2013) ("[T]he ALJ could rely on the VE's job incidence figures derived from *Job Brower Pro* [sic] considering that the jobs were then filtered through his own professional experience, judgment and expertise before endorsing the numbers provided."); *Palmer v. Astrue*, No. 1:10-CV-151-JGM, 2011 WL 3881024, at *6 (D. Vt. Sept. 2, 2011) ("[T]he vocational expert's testimony here was based on identifiable statistics, and he offered a conservative estimate of the available number of jobs based upon those numbers, informed by his expertise and experience. This is sufficient to satisfy the 'substantial evidence' standard."); *Conn v. Sec'y of Health & Human Servs.*, 51 F.3d 607, 610 (6th Cir. 1995) ("[T]he ALJ was within his rights to rely solely on the vocational expert's testimony. The social security regulations do not require the Secretary or the expert to rely on classifications in the *Dictionary of Occupational Titles*."). To remand on these grounds would not only subject ALJs and VEs to far more stringent evidentiary requirements than Congress intended, but also flout this Circuit's tradition of granting ALJs substantial deference in weighing VE testimony.

For these reasons, this Court should find the ALJ's reliance on the VE's testimony supported by substantial evidence.

### H.   Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Grunwald's Motion for Summary Judgment, (Doc. 21), be **DENIED**, the Commissioner's Motion, (Doc. 25), be **GRANTED**, and that this case be **AFFIRMED**.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which

36

it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  May 18, 2017                        S/ PATRICIA T. MORRIS
                                           Patricia T. Morris
                                           United States Magistrate Judge


## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: May 18, 2017                        By s/Kristen Castaneda
                                          Case Manager